King, J.
This case is tried in this court on appeal from the judgment of the court of common pleas. The pebitionjjj is entitled “Petition to set aside fraudulent conveyance, ” and it alleges that the defendants Mary and Elizabeth Wehrle were at one time partners doing business in the city of San- *536 dusky under the name of The Wehrle Coal Company, and that these persons beoame indebted to the plaintiff and to sundry other persons named in an amount averred in the petition to be $35,000; that on December 15, 1896, these persons, together with the defendant Andrew Wehrle, were so indebted to the plaintiff and others, and that on that day, with intent to hinder, delay and defraud the plaintiff and other creditors, they executed and delivered to the defendant August Schmidt, Jr., a certain pretended bill of sale whereby it was attempted to convey to August Sohmidt, Jr., all the personal property and book accounts hereinbefore mentioned and belonging and possessed by and in the possession of the defendants Mary, Elizabeth and Andrew Wehrle, and on the same day delivered all of the said personal property to said Augast Schmidt, Jr.
A further allegation contained in the petition is that the said conveyance to Schmidt was made in trust for the purpose of preferring certain creditors of the Wehrle Coal Company and Andrew Wehrle, and that by the terms of the trust August Schmidt, Jr., in consideration of the sale to him of said personal property, agreed to pay off certain indebtedness of The Wehrle Coal Company. The terms and particulars of the trust the plaintiff is unable to further state. The petition also avers that on the same day the defendant Mary Wehrle, for the purpose of hindering, delaying and defrauding the creditors of the said firm The Wehrle Coal Company, made a pretended conveyance to the defendant W. H. A. Read, who was an attorney-at-law and also the attorney for the said Mary Wehrle, of oertain property, to-wit: oertain shares of stock held and owned by Mary Wehrle in a corporation known as The Sanduskv & Islands Steamboat Company, said shares of stock being worth at least $10,000, and avers now that both these conveyances, the one to Read and the one to Schmidt, Jr., were without any consideration,and were made for ‘the purpose of hindering, delaying and defrauding creditors of The Wehrle Coal Co. in the collection of their debts. The action is brought on behalf of the plaintiff, the bank, and all the other creditors who may join in the case, and the prayer is that the sales and conveyances be set aside and a trustee appointed to take oha'rge of the property.
Answers to this petition were filed by the defendant Sohmidt and by the defendants Mary and Elizabeth Wehrle denying all the allegations of fraud and the allegations that the conveyances were made with iutent to hinder, *537 delay and defraud creditors,and averring that these convey anees were made on the fourteenth of December instead of the fifteenth,fer a valuable consideration and in good faith, and were valid.
The action is brought ostensibly under section 6344, Revised Statutes, but perhaps may be sustained under seotion 6348. Section 6343 provides:
“All assignments in trust to a trustee or trustees, made in contemplation cf insolvency with intent to prefer one or more creditors, shall inure to the equal, benefit of all creditors, in proportion to the amount cf their respective claims, and the trust arising under the same shall be administered in conformity with the provisions cf this chapter.”
Section 6344 provides that “All transfers, conveyances, or assignments, made by a debtor or procured by him to be made with intent to hinder, delay, or defraud creditors, shall be declared void at the suit of any creditor.”
The evidence in the case submitted is quite voluminous, and it has been discussed by able counsel cn beth sides, .and we have given it suoh consideration as we thought the importance of it demanded.
Briefly stated, the main facts of this transaction are: The coal business oarried on by The Webrle Coal Company has existed in the city uf Sandusky for fifteen or sixteen years. It has had various proprietors. It has been owned and carried on by August Schmidt, Jr., by Andrew Wehrle and by Andrew Wehrle, Sr., and by Mary Wehrle, and by Mary Wehrle and Elizabeth Wehrle, and was owned and carried on at the time of these transactions by Mary Wehrle and Elizabeth Wehrle. Andrew Wehrle, Sr., owned and carried it on about two years before this transaction, and about a year before he died he conveyed it to his wife, Mary Wehrle, and she owned it for something more than a year. In January, 1896, Andrew Wehrle, Sr., died, his wife at that time' being the owner in her own name of the coal business, and soon after he died the defendant, Elizabeth Wehrle, who is the wife of Andrew Wehrle, Jr., bought an interest in the business, which is said here to have been a half interest, and probably was, and some time about February, 1896, the business was owned and carried on by these two women, Mary Wehrle, the widow of Andrew Webrle, Sr., an aged lady who resided on Middle Bass Island, and Elizabeth Wehrle, the wife of Andrew Wehrle, Jr., who resided in Sandusky; that at the time of Andrew Wehrle, Sr.’s death he was also the owner of other proper-^ *538 ty, and was interested in a partnership under the firm name of Andrew Wehrle & Son. After his decease application was made to the probate court by one of the parties interested, either the administrator or the surviving partner, for an appraisement,and an appraisement was had, and the son, the surviving partner, elected to take the business and executed a bond as provided by statute in the sum of $110,000 for the payment of the debts of the firm, which was approved by the court, and for the assets of the firm which were turned over to him, the undivided half which he did not own, which was appraised at $14,652.04, he made his promissory note to the administrators of the estate. His name is Herman Wehrle, and he is not a party to this action. He gave his promissory note, with approved sureties, and the note was a joint and several note without indication that any of its makers were sureties for the others, and was signed by Herman Wehrle, by Mary Wehrle, his mother, by Andrew Wehrle, his brother, by Catherine Wehrle, his wife, by Elizabeth Wehrle, Andrew’s wife, and by August Grief and Joseph Rauer, persons who are nonresident of the state, but relatives, I think, of Mrs. Herman Wehrle. The note ran nine months from its date, and matured on December 14th, and became legally due on December 17, 1896, with interest. The will which Andrew Wehrle, Sr. left appointed his wife Mary Wehrle as the executor of it, but shortly afterwards August Schmidt, Jr. was appointed administrator of the estate of Andrew Wehrle to act with this executor. He gave bond and qualified, and together with Mrs. Andrew Wehrle executed this trust and they were in the execution cf it on the fourteenth of December, 1896.
I should say that the business of the execution of this trust, so far as there was any business, was attended to by-August Schmidt, Jr., as he was an active business man residing at Sandusky, and Mrs. Wehrle was of old age and feeble health, and perhaps generally unfitted for attending to business matters. Shortly before this note matured Mr. Schmidt placed it in the Third National Exchange Bank for collection, and the customary notices were sent to all the makers that it would mature on December 17th. On December 12th, Herman Wehrle, the maker, appeared in Sandusky and saw Mr. Schmidt, and told him he could not pay it when due, and he was informed by Mr. Schmidt it must be paid when due, that that was his understanding of the situation; that it would be his duty as administrator to *539 see that the note should be collected; he had no authority to execute another agreement by which the time of the payment of the note should be extended for a definite period. Herman, saw Andrew Wehrle and his wife Elizabeth, and probably he sent word to Toledo for an attorney who had acted for the family, and especially for Mary, his mother, Mr. Read, and he came down. The parties, however, accomplished nothing on that day and went to their several homes,and on Monday, December 14th, they returned again. They had the information from Mr. Read, as well as from Mr. Schimdt, that the Lote when it matured, would have to be paid or be collected. There was nothing in that statement, we think, which was prejudicial to anybody’s rights. It was simply a statement that in the opinion of the attorney the administrator could not grant any extension of time. If the attorney gave that sort of advice unquestionably it was correct. The administrator could not have extended the time of the payment of that note. It would have released the sureties,and he had no authority at law to do it. There might have been delay in the process of a suit for collection but that would be another matter. On Monday the parties again met, including Mrs. Mary Wehrle, who came over from the island, and there was a discussion of what was best to do-and what would have to be done,and what would be the result if they did not do it.
It was suggested in the talk amongst them that if the note had to be paid and it was not paid on December 17th, an action would be commenced, levies, executions or attachments or something would be made upon Herman Webrle’s property. That would unquestionably result in time, and Mrs. Wehrle was very much exercised beyond doubt to think that her son Herman’s property would be disturbed, or that any of it would be sold upon execution, or his business interfered with by the officers of the law. He had only been in business running this far for about nine months. He had upon his shoulders a very large indebtedness,nearly equal to the value cf the property he had taken, the difference being the note in suit principally, and she seemed very much worried to think that there should be any interference with Herman Wehrle’s business. Some suggestion was made to her by persons intimate with her but not connected with the family — Mr. McFall, for instance, was one — that they had better sell out their coal business and pay that note, and that was talked over in Sandusky,and the women who owned it had agreed that it should be done, and their *540 talk with their attorney aboutjt whom they sent out to negotiate the sale was that it should be sold for the amount cf the note if that sum could be procured. He drew up a bill of sale with a blank for the purpose of inserting the name of the purchaser, in which he expressed the consideration at the face of the note, and went out and undertook to sail the property. He applied to Mr. Eugene McFall, and in the course cf time he applied to Mr. Hunt who had been the bookkeeper in this concern for a great many years; he applied to Fred Zollinger, and through him to J. C. and Frank Zollinger, and he applied alsc to Lawrence Cable, each of whom had expressed an opinion that they would like to buy the business. Mr. Cable desired tc buy it to put bis sons in, Mr. Fred Zollinger desiring to interest himself in the purchase in order to put F. T. Zollinger in the business, and Mr. McFall desired to interest himself with others in the purchase of it mainly perhaps for the purpose cf controlling coal that should go to the,boats in which he was interested, and Mr. Hunt, who had been in that business and no other, desiring to buy it in order to have a place where he could work, although he had but little capital that he could invest. Nothing was said to August Schmidt about buying it, but on the evening of Deoember 14th, Mr. Read did suggest to August Schmidt that he understood he had been in the business before and why should not he buy it. Very little was said about it. Mr. Schmidt did, however, talk the matter over a little with Hunt, with what result we are not fully informed. He went to the office, and with Hunt went over the books of the firm and made an estimate of what he considered the property worth. The next morning Mr. Read had an appointment with the Zol1 ingers at half past 8. I should say that he had been offered $10,000 for this property by Mr. Eugene McFall. In the morning he went tc the bank and saw the Zollingers, and they made him an offer of less than $10,000.
He told them there was a higher offer made and he should not consider it, and they considered awhile and made him an offer of $10,000. He told them there was an offer of $10,000 ahead of them, and the first offer would be first considered. They then considered the question of raising it and finally told him they would not raise the offer of $10,000. Pending that, however, Mr. Hunt came in and either made an absolute or conditional offer of $10,000. At any rate Mr. August Schmidt appeared upon the scene about 9 o'clock and he offered $10,250,and Mr. Hunt said in *541 the course of talk that his offer was really intended for Schmidt, or else he said that if they sold the business to Mr. Zollinger, or to Mr. Cable, or to Mr. Schmidt, he would interest parties in its purchase at a price of $10,250. (All of that, however, is largely immaterial except as throwing light upon what was done towards selling the property.) The parties were all seen by Mr. Read and the proposition of $10,250 submitted to them, and they said they would not raise it; $10,250 was all the property was worth and they would not think of paying any more, and Mr. Read thereupon sold the property to Mr. Schmidt for $10,250.
He first inquired before he did whether Mr. Schmidt could pay him. He inquired of the cashier of the bank,and the cashier told him Mr. Schmidt’s check for that amount would be accepted by the bank and paid. When the time o ame to pay the money on the note,Mr. Schmidt being in the bank and the cashier being present, Mr. Schmidt f*d to the cashier without writing a cheok “You pay Mr Reed $10,500 and charge to my account.” Mr. Read said that the parties whom he represented did not want the money, that all they wanted was if they received it they should turn it directly back to Mr. Schmidt as administrator of the estate desiring to pay it upon this note which would be due in two days from the time they were speaking, and thereupon the note was produced, it being in the bank, and by direction and agreement cf all the parties that were present Mr. Read, representing Mary Wehrle and Elizabeth, the wife of Andrew Wehrle, and Mr. Schmidt, who was the acting administrator, Mr. Zollinger, the cashier, wrote upon the ba'ck of the note an indorsement that there was paid on that day $10,250, and the note without handing to Mr. Schmidt was left in the bank where it was.
Mr. Schmidt had no account as administrator at that bank or any other. No money was in his hands belonging to the estate, and it is claimed here that the estate was insolvent, although we are not furnished with the figures bearing upon that; that the only property which this estate had available for the payment of debts was this note for $14,652.04. No money was counted out or handed to any of these parties and no account was therefore opened in the name of Schmidt and Mrs. Wehrle as administrators. This money was charged to Mr. August Schmidt in as much as administrator he had received the benefit of a payment of $10,250, and that the administrators were chargeable with that sum of money,and that to enter it upon the note which *542 was to remain in his possession was a sufficient entry cf the transaction, and that is the way it occurred.
Now there are numerous other things which may be referred to. It is olaimed that this transaction should be set aside first, because it was a transaction among relatives; second, it was in secret and not open and public; third, it was a sale of all of the property of the Wehrle Coal Company,and also a sale at an inadequate price, and lastly, and-principally, because no mcney passed between the parties, and that nothing was done except to minute the transaction upon the back of the note,and it is claimed this is sufficient evidence that the whole thing was a fraudulent scheme .to put the property out of the hands of its owners for the purpose cf hindering and delaying the creditors cf the firm-from collecting their debts.
Now, as to thes3 parties being relatives, so far as Mr. Schmidt is concerned, although he was a relative and co-administrator, he had very little to do and knew very little in fact about the coal business, this coal business in particular, at and for some years preceding this sale tc him. He testifies that he had not been for some two or three years at least on gcod terms with Andrew Wehrle who managed it, and had nothing whatever to do with him, and he knew nothing about his business, knew nothing in fact about the condition it was in. He examined the books, but he did not ascertain the amount of the firm’s indebtedness. He did ascertain, however, and got enough information there to probably inform him that the firm was indebted, but the amount he did net ascertain. He says the two principal accounts which are here claimed and which are here shown to be the two principal accounts, that of the Superior Coal Company and the Rhodes & Beidler Goal Company, amounting together to over $15,000, appeared upon the bocks, and he saw them, but they appeared not to have been balanced, whether by cash entry or an entry of the giving of notes he does not say; he says he do9s not knew.
But we find that he knew the firm was indebted; we also find he did not know how much they were indebted. We do-find, for it is a perfectly transparent fact in the case, that he knew that these parties were .indebted to him as administrator of the estate of Andrew Wehrle,deceased,in the sum of $14,65.04 and the interest on it, being over $15,000. He knew practically and substantially the amount of money which Mary Wehrle would get from the estate, and if the testimony in the case is to be believed,that was nothing ex *543 cept her year’s allowance and such personal property as might be set off to her. He knew the condition in which Herman Wehrle was situated. ■ I should have said Herman Wehrle was saying and had been since he first received the notice that he could not pay this note when it became due, that he had not any money to pay it with. He knew his condition and how his business was situated, and as I say,he knew that the two Mesdames Wehrle owed this note, and that neither of them had any means with which they could pay it aside from this coal business. As to what he may have known about these two persons who resided in another state, in St. Louis, I think, it is said they live, the evidence does not disclose, but the parties upon this promissory note at the time when this sale was made were at least doubtful. No money could be made out of it except by process of law, and how much could be made at the end of an execution nc one could tell; it was mere conjecture. He knew that. There is nothing in his relationship to the parties, and nothing in his knowledge of his condition and circumstances, whether they owed or did no owe firm creditors, to in our judgment impeach the validity of this transaction and it brings me down to really twc other questions, whether there is an adequate consideration,and whether the manner of its accomplishment, the entering cf this credit, is a sufficient indication of its fraudulent character to authorize us to 9et it aside.
Mr. Schmidt testifies as to the basis upon which he made his offer cf $10,250. He made a memorandum himself putting a value upon all of the artioles. He thought the office was worth $500.00. There is no evidence in the case to show that it was wcrtn any mere, and a fair preponderance of the evidence would indicate that the office was not worth over $400. He gave the horses at $200,and there isnoevidenc tc indicate they are worth more than $200, hut there is some evidence to indicate horses like those might have been purchased for Jess. He gave the carts and wagons at $100, and there is no evidence to indicate they were worth mere than $100; they are old carts and wagons. A pair of scales is put dewn at $100, and there is only the testimony, of one witness who says those scales might be purchased and set up for $75. There is hard coal which he put down at $5 per ton, estimates at 865 tons when an investigation thereafter shows there was 350 tons. The soft coal is put down at $2, and the oannel at $2.50, and there is no evidence that it is worth any more,or that there was any more of it than is es *544 timated. There was $669.28 in the bank, and the derricks, which he put in at $1,000. This estimate makes the property of the coal company, the tangible property, about $4,600. Then he added up and computed the amount of the aooounts upon the books and sorted them off inte good, far and poor. The good accounts footed up $7,750, and the poor accounts about $4,600. The poor accounts include claims for rebates on freight aocounts with two railroads, one in the hands of a receiver. We are not prepared to say from the evidence whether these accounts were good — I mean by that, legal acoounts — whether they were such claims as payment could be enforoed cr not from the meager evidence in the oase before us. The total face of these accounts as found by Schmidt, including the property, footed up about $16,000, but, as I have said, the tangible property was only $4,600, and the rest of that amount was made up of aocounts against divers and sundry people living here and elsewhere; and on the basis of that Mr. Schmidt, as I say, made an offer of $10,250.
The circumstances I have related show that the other parties named — and there is nothing to show they were at the time at least in connivance at all with Mr, Schmidt — 'take Mr. Cable, take the Zollingers who had expressed a desire to go into this very business — they had taken a bill of these items which Mr. Read himself furnished, in which the values were placed at over $17,000, and investigated it for themselves, and they said they would not pay for this business more than $10,000. On that we conclude that there is no suoh inadequacy cf price as raises any suspicion of fraud in this sale. The inadequacy of prioe that is sufficient to constitute fraud is laid down in Bump on Fraudulent Conveyances, page 46, and a case in 84 Iowa, page 77. In Bump it is said:
“To justify an inference cf fraud from the inadequacy of the price alone, the consideration must be so clearly below the market value as to strike the understanding at once with the oonviction that suoh a sale never could have been made in good faith.”
That brings me then to the last question which I want to consider in connection with certain propositions of law that have been argued, whether the manner in which this sale itself was completed is sufficient to authorize us to hold that it was a nullity, and we shall look at it as we think it-was viewed by the parties who were engaged in it.
Concede that Mrs. Wehrle desired to save her son Herman. *545 Concede that she and the other Mrs. Wehrle as a coal company were indebted beyond the amount of their property, and upon this point we find they owed at least $16,000.j of debts,and they had this property that was turned out to Mr. Schmidt for $10,250, and they had no more. They owed also this note cf whioh I have spoken, and the transaction vas as I have related. Was there anything in it that was unnatural or unreal? On the contrary, we think it was an entirely natural transaction in and of itself. That there was nc more form pursued is certainly an element in its favor, for cne of all the badges of fraud that are spoken of in the books is the formal manner of accounting'by making written receipts and making out contracts and having everything done in such wonderfully precise form when business men take a much more shorter cut to reach the same end. Mr. Read said he did not want to handle this money for his clients; that that money was tc be paid to Schmidt as executor, and to be indorsed upon the note upon whioh they were indebted. Thereupon all parties agreed it should be indorsed upon the ncte, and thereupon the indorsement was made.
Now that indorsement had some effect. It had the effect to release upon that note to the extent of $10,250 every single maker cf it, and none of the makers of that note are parties in this action except the two Mesdames Wehrle and Andrew Wherle, Jr. It had the effeot to release four of the makers upon that note that can net be bound nor prejudiced by any judgment that might be rendered in this action. It may have had a further effeot. It may have had the effect to have authorized the executors of this estate to delay some action whioh they might have commenced, and to have the benefits of some property which they might havereaohed on the seventeenth day of December if the ncte had not then been paid, or so much of it paid.
But it is said that these partners have taken the property which they owned tc pay an individual liability instead of appropriating it to pay partnership creditors. But can they not do that? It seems to us that the authorities upon that subject are simply overwhelming, If we went no further than this state we should find an authority for it. But reverting for a moment to the question cf the consideration. I want to refer to section 204 of Bump on Fraudulent Conveyances. I use this, although I may probably find it elsewhere, because this book has been cited to us by counsel on both sides.
*546 “The consideration must arise at the time of the transfer. It is not, however, necessary that an aotual payment shall be made. A promise to pay, or the giving of securities will constitute a party a purchaser. A check given in good faith on a banker having funds to pay it is prima facie payment if accepted as cash, although its payment is subsequently suspended on account of a controversy concerning the property. A transfer may be made for an annuity as well as for money in hand. An existing debt or liability, either as indorser or surety, is sufficient. The debt may also be unliquidated, etc.”
Again, in the same author we find in section 170, relating to this subject of preference and the right of the party to use his own property as he pleases in the payment of his debts:
“A preference may be given and received for the express purpose of defeating an execution, for the mere intent to defeat an execution does not of itself constitute fraud. The payment of a just debt is what the law admits to be rightful, and is not, therefore, fraudulent, either in law or in fact. The preferred creditor cannot be affected injuriously with notice of the debtor’s intent to prefer, and thereby defeat an execution, because the purpose is honest, and such as the law sanctions. This is no delaying or hindering within the meaning of the statute. It does not deprive other creditors of any legal right, for they have no right to a priority. One creditor of a failing debtor is not, under the statute, bound to take care of the others. In such case, if the assets are not sufficient to pay. all, somebody must suffer. It is a race in whioh it is impossible for every one to be foremost. He who has the advantage, whether he gets it by the preference of the debtor or by his own superior vigilance, or by bcth causes combined, is entitled, under the statute, to what he wins, provided he takes no more than his honest due. He is not obliged to look out for other creditors, or tc consider whether they will or will not get their debts. He does not violate any principle of the statute when he asks payment or security for his demand though others are hereby deprived of all means cf obtaining satisfaction of their own equally meritorious claims, and though he may be aware of the intent of the debtor to defeat the collection of them. Fraud, in its legal sense, can not be predicted of such a transaction. Wherever there is a true debt, and a real transfer for an adequate consideration, there is no collusion.”
*547 Our own Bupreme court have expressed themselves probably stronger. In Cross, Trustee, v. Carstens, 49 Ohio St. 548, the court said:
“In the many decisions upon the general subject from Atkinson v. Jordan, supra, to its last deliverance upon the question, (save in the overruled case of Mitchell v. Gazam, 12 Ohio, 315), this court has not omitted tc affirm the right of a debtor, in failing circumstances, in good faith, to pay or secure, one or more creditors in preference to others. Wilcox v. Kellogg, 11 Ohio, 394; Fassett v. Traber, 20 Ohio, 540; Doremus v. O’Harra, 1 Ohio St., 45; Atkinson v. Tonlinson, Id., 237; Bloom v. Negle, 4 Ohio St., 45; Harkrader v. Leiby, Id., 602; Dickson v. Rawson, 5 Ohio St., 218; Badaley v. Waters, 7 Ohio St., 359; Justice v. Uhl, 10 Ohio St., 170. From an examination of these decisions it will appear clear, if decisions can establish anything, that it is established beyond question, that however equitable it may seem to require the assets of an insolvent debtor to be distributed pro rata among his creditors, our statute fails to make compulsory provision for that end. But, on the oontrary, it permits preference, if made in gcod faith, though but little be left, or nothing at all be left, for other creditors equally meritorious.”
On page 573 the court say: “The right of preference rests upon the natural right to acquire and control property. The jus disponendi is necessarily an element of ownership. To authorize the citizen to acquire property would be of little use if he had not the corresponding right to dispose of it. So long as he retains his dominion over it the property is his to do with it what ha wills, save only that it must not be devoted to an unlawful purpose. Our statute, section 6335, fixes the time when an assignment for the benefit of creditors shall take effect. It is, at least so far as the transfer of control over the property is concerned, only from the time the deed of assignment is delivered to the probate judge. ”
In that case a firm hopelessly insolvent conveyed all their property to a mortgagee to secure certain creditors,and within an hour after executing the chattel mortgage filed a deed of general assignment in the probate court, showing beyond question of course their own knowledge of their hopeless insolvency.
But we are not left upon the main question in this case to that authority, for the supreme court of this state many years ago decided almost precisely the same question in the *548 case cited to us and found in Sigler v. Bank, 8 Ohio St., 511. In that oase so far as the facts were concerned they were much stronger in favor of the creditor seeking to convert into a general assignment the transfer than in the case before us. In that case all the property of the insolvent firm was conveyed to an individual to secure and pay the individual debts, or some, at least,of the individual debts of one of the partners,and thereby excluding in participation of the firm property all of the firm creditors. Perhaps there were some firm creditors included in this conveyance, but excluding all those that W6re not included in the conveyance. And there was argued by very able counsel the proposition that they could not take the firm property when they were insolvent, actually insolvent, knowing they were, oould not then appropriate the firm property to pay an individual debt, that in fact they had become insolvent and acquired knowlege of their own insolvency, therefore that property they held in trust first and foremost for the firm creditors. Now the court say, on page 516:
“The right to have the joint assets applied to the joint Habilites, to the exclusion of the separate creditors, is the personal right of the partners themselves, and does not pertain to the joint creditors who have not acquired, by previous levy or seizure, a Hen on the joint effects; and any right whioh they may have to such application, must, it is said, be worked out through this equity to the partners. “And it would seem to follow from the facts — that the creditors have no such lien, and that their claim, if any, must be based upon this right of the partner — that if the other partners should acquiesce in and agree tc such appropriation to the separate creditor, the joint creditor oould not thereafter object. And so are the authorities.
“When the primary right of partners to apply the partnership property to the extinguishment cf the partnership debts is gone, the right of the partnership creditors tc enforce the application of the property of the firm to the payment of their debts, is also extinguished:” Miller v. Estill, 5 Ohio St., 508; see also, Wilcox v. Kellogg, 11 Ohio St., 394; Rice v. Banard et al., 20 Verm., 479.
I need not go over this discussion fcr it is somewhat lengthy, but on page 518 the court say:
“But, in our opinion, it would never do to adopt a rule so uncertain, as that the power of the partners over the joint property is to cease, whenever it can be shown that their assets, for the time being, are insufficient to discharge their *549 liabilities. Such a rule would be productive of much inconvenience, injustice and uncertainty. The true rule should be, that the power of partners thus to act ceases from a mere inability at the time to pay their debts.
“The simple fact that men may be insolvent in the popular sense of the word, dees net deprive them of the power of selling their property by bona fide sales.”
And again on page 519:
“We have already seen that there is no actual fraud in the sale and purchase. They bought from those who had, at the time, the dominion and control, and right of disposition, if they saw fit, to the separate creditors. The only person, the other partner, who had the right to object, having consented to the appropriation, it is difficult to see how such a transaction can raise a trust, either express or implied, in favor of creditors, who, under repeated decisions in Ohio, have no lien on, or right to, the property, except such as is derived from and dependent upon the right of the co-partners themselves.”
This then, establishes the law for our guidance that these firm creditors have no more rights before this court than have the individual creditors. Well, it is said that these people, the Wehrle women, were but sureties; but they are jointly and severally bound as makers of this promissory note, and as sureties they were equally liable with the principal for the payment of the whole amount of the indebtedness. To say that they were not indebted to this estate, would be a strange assertion in view of the fact that the object of the statute requiring a surety is what? Not simply to make him a guarantor that he shall pay in case the principal shall not be forced to pay, but to make him individually and personally liable for the debt, that it might be collected of him; and on December 17th, these women could have been sued and Herman Wehrle omitted from the action so far as the face of this paper is concerned. They could have been sued jointly or severally for the collection of this debt. So. that indebtedness existed notwithstanding that Mrs. Wehrle said she did this for the purpose cf saving the principal on that note from having his business interrupted or his property taken away from him; this surety had a right to appropriate her property to the payment of that principal debt beyond all question; it cannot be denied successfully.
This is a much stronger case than Sigler v. Bank, supra, *550 because both of these partners wer? indebted. Both of these partners, equally indebted u'pon this promissory note, took their partnership property and paid the individual liability of the two rather than the firm liability of the two. No court has ever held that kind of a transaction fraudulent, and we conclude, then, that we cannot hold the sale of this property to August Schmidt, Jr., as being made with intent to hinder, delay and defraud creditors without plainly shutting our eyes both to the law and the evidence in the case.
He paid good value, a good consideration. The transaction was, so far as he was concerned, open above board. It was the highest price that the agent of these owners could obtain at the time, and conceding all the other claims that Mr. Schmidt knew these people were insolvent, knew that they were indebted more than they could pay, it does not aid the plaintiff at all. Knowing that and knowing that he as executor held a claim against them whioh was greater than the value of all the property they owned, so much the more would have been the duty incumbent upon him to secure from them this very property to pay that debt with, and if that had been the sole ground of his action it would have been entirely meritorious. The only other thing that he did about it was as an individual against other bidders; it was to make his offer for this property as against other parties, which was finally accepted. The amount of that offer, the amount of the purchase price was indorsed upon the paper which he held. We hold, then, as to this sale, we cannot set it aside.
Another question, and that I can only say a few words about. Before this sale was made, Mrs. Andrew Wehrle, who was the owner of 25 shares of boat stock, worth anywhere from $2,500 to $8,000, made a proposition to give it away to her daughter, and had asked the officers of the boat company, of which Mr. Schmidt was president, to transfer it, and they did not do it. They took advice from Mr. Read who thought it was incumbent upon them to do it if they were instructed to do.so by the-owner. The following day, and after the sale was made, Mr. Read, the attorney for Mrs. Wehrle, something more being said about the stock, asked why she should not give it to him. They had some conversation about it. and she gave it to him, as Mr. Read says, for the payment of his attorney fees, which, Mr. Read says, had been inourred in various consultations with her running since the death of her husband and services rendered, and which, he thinks, were of the value of $1,200. He also testifies that the agreement was, it was to be trans *551 ferred to him for the payment of those and any services he might thereafter render. Mrs. Wehrle testifies she did not know any thing about his bill, he never had presented one, and whether she owed him or not she does not know, but she is quite sure she did not owe him $2,500, and Bays that he took the stock to save it for her. She had an idea that this stock would be called on by Schmidt to help pay up this note or secure it, but at any rate-she turned it over to Mr. Read who on the same day, without any obligation on his-part to do so, indorsed it over to Schmidt and took a receipt back that it was held to secure the balance of this note of $15,000.
Phinney & Merril, Theodore Alvord, J. W. Bannon, H. H. Poppleton and W. F. Carr, for Plaintiff and Cross-petitioning Creditors.
John F. McCrystal, W. H. A. Read and C. P. Wickham, for defendants.
We cannot go into that transaction and analyze it, but we are satisfied from the evidence in the case that there was nc consideration for the transfer of this stock, and that the title of it never passed; that it w'as, however, taken by Mr. Read as security to pay a debt due to him. We think that is certain,and that he might hold it for that security. We are not prepared to hold otherwise; but when w« come to the question of the amount of the debt we are very much at a loss to determine what it is. There is no evidence here of the amount of these services,and no evidence of their value. Mr. Read says his claim is $1,200,and his claim for services rendered since considerable more. We think he cannot hold it for services rendered since, but only for the services that had been rendered and approved up to the time of the transfer to him.
We first thought we would refer this matter to have the amount of these fees determined, but we have concluded to determine them ourselves, and fix the amount of Mr. Read’s lien on this stock at $500. We direct that the holder of this stock, Mr. Schmidt, shall turn it over to the trustee whom we shall appoint, and that the trustee is to sell this stock upon twenty days’ advertisement in two newspapers of general circulation in this county and city. We will not make an order about the proceeds.
I should say the amount of money coming to Mr. Read from that sale will be $100, and he is to credit on his claim the $400 which he has collected as dividends.